**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CV-61939-DAMIAN/STRAUSS**

**GLAXO GROUP LIMITED and**
**GLAXOSMITHKLINE INTELLECTUAL**
**PROPERTY DEVELOPMENT LIMITED,**

Plaintiffs,

v.

**TRANSPIRE BIO INC.,**

Defendant.

_______________________________________/

**ORDER ON MOTION FOR PROTECTIVE ORDER**

THIS MATTER came before the Court upon Defendant's Corrected[1] Motion for Protective Order Regarding Certain Privileged Communications and Documents [DE 124] (the "Motion"). District Judge Melissa Damian has referred the motion to me for appropriate disposition. *See* [DE 95] at 3; [DE 103] at 2. I have reviewed the Motion, Plaintiffs' Response [DE 136], and the pertinent portions of the record. For the reasons stated below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

### I. ORIGIN OF CASE AND DISCOVERY DISPUTE

This action arises out of alleged patent infringement by Defendant Transpire Bio Inc. ("Transpire"). *See generally* [DE 1]. Plaintiffs Glaxo Group Limited and GlaxoSmithKline Intellectual Property Development Limited (collectively, "GSK") challenge, among other things, Transpire's attempt to produce a generic version of GSK's Breo Ellipta inhaler via the statutory and regulatory framework for an Abbreviated New Drug Application ("ANDA"). *See id.* ¶¶ 1-6.

[1] The Court will deny the uncorrected version as moot.

The complaint includes counts for infringement of several of GSK's patents. *See, e.g.*, [DE 1] at 26, 39, 56, 74. It also includes counts for trademark infringement and unfair competition under the Lanham Act, along with state-law claims for the same. *See id.* at 92, 93-94. Transpire later filed an answer with affirmative defenses and a separate counterclaim. *See generally* [DE 34]. Transpire's counterclaim seeks a declaratory judgment of noninfringement and invalidity of one or more of GSK's patents. *Id.* ¶ 1, at 51. It further seeks a declaratory judgment of noninfringement, and cancellation, of certain trademarks and trade dress owned by GSK. *Id.*

The current discovery dispute arises out of Transpire's withholding of forty-six documents or communications because of its asserted attorney-client privilege or work-product protection. *See* [DE 107] at 1-5; [DE 124] at 1-14; [DE 136] at 1-15. Specifically, the parties dispute whether documents or communications that involve two third-party consultants, DCA Design International Limited ("DCA") and Pryme Agency LLC ("Pryme"), must be produced to GSK. *See* [DE 124] at 1-14; [DE 136] at 1-15. Transpire retained DCA and Pryme to assist with the design, packaging, and labeling of its generic version of the Breo Ellipta inhaler. *See* [DE 124-2] ¶¶ 19-27, 35-44. While GSK believes that neither the attorney-client privilege nor the work-product doctrine protects the items in dispute, *see* [DE 136] at 1-15, Transpire insists that these items are protected from production and therefore seeks a protective order preventing their disclosure, *see* [DE 124] at 1-14. In support of its Motion, Transpire provided, among other things, a privilege log and declarations from representatives of Transpire, DCA, and Pryme. *See, e.g.*, [DE 124-1, 124-2, 124-3, 124-4].

## II. REGULATORY FRAMEWORK RELEVANT TO DISCOVERY DISPUTE

A new drug cannot be marketed or sold in the United States without the Food and Drug Administration ("FDA") first approving it. *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d

1294, 1296 (11th Cir. 2003) (citing 21 U.S.C. § 355(a)). Two main ways exist for a company to apply for FDA approval. *Id.* First, a company can file a New Drug Application ("NDA"), which requires submitting exhaustive information about the drug, such as reports of safety and efficacy studies. *Id.* (citing 21 U.S.C. § 355(b)(1)). The NDA method is the "full-length" application process for "brand-name" drugs. *Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 339 (3d Cir. 2020). Second, companies can seek to market a generic version of an already-approved drug via an abbreviated new drug application, i.e., ANDA, which "allow[s] a new drug applicant to piggyback on the safety and efficacy studies conducted for the pioneer drug . . . ." *Valley*, 344 F.3d at 1296 (citing 21 U.S.C. § 355(j)). Though, the ANDA applicant must show that its proposed generic drug is the same as the brand-name drug in certain respects and that it will not infringe the patents relating to the brand-name drug. *AbbVie*, 976 F.3d at 339 (citations omitted); *Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1231 (11th Cir. 2005).[2]

As it relates to the second method for obtaining FDA approval, an applicant submitting an ANDA must certify one of four things:

> (1) that the drug for which the ANDA is submitted has not been patented (a "paragraph I" certification); (2) that any patent on such drug has expired (a "paragraph II" certification); (3) the date on which the patent on such drug will expire, if it has not yet expired (a "paragraph III" certification); or (4) *that the patent on such drug "is invalid or that it will not be infringed by the manufacture, use, or sale of the new drug" for which the ANDA is submitted (a "paragraph IV" certification)*.

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1131 (Fed. Cir. 1995) (emphasis added) (citing 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV)). "When an applicant submits an ANDA that contains a paragraph IV certification, it must give the owner of the relevant patent notice of the

[2] A third method, a "hybrid NDA," also exists for a company seeking to modify another company's brand-name drug. *AbbVie*, 976 F.3d at 339.

certification." *Id.* (citing 21 U.S.C. § 355(j)(2)(B)). Paragraph IV certifications are deemed an act of infringement subject to suit. *Id.* "If the ANDA contains a paragraph IV certification, and all applicable scientific and regulatory requirements have been met, approval of the ANDA 'shall be made effective immediately' unless the patent owner brings an action for infringement . . . within forty-five days of receiving the notice . . . ." *Id.* at 1131-32 (citing 21 U.S.C. § 355(j)(4)(B)(iii)).

Relevant to this case, Transpire is seeking FDA approval for a generic version of the Breo Ellipta inhaler device and has submitted an ANDA with a Paragraph IV certification. *See generally* [DE 1]; [DE 34]. GSK is the maker of the Breo Ellipta inhaler and alleged holder of several patents relating to the device. *See generally* [DE 1]; [DE 34].

## ANALYSIS

For the reasons stated below, I conclude that the documents and communications at issue may be protected; however, Transpire has not provided enough information for the Court to enter a protective order for each document or communication at issue (at least at this time). The Court will therefore order Transpire to supplement its privilege log and/or provide additional evidence to GSK to support its supposed claims of attorney-client privilege and work-product protection.

### I. ATTORNEY-CLIENT PRIVILEGE

Transpire first argues that the at-issue communications are protected by the attorney-client privilege because DCA and Pryme, despite being third-party consultants, functioned as extensions of Transpire in facilitating attorney-client communications. *See* [DE 124] at 6-7. GSK responds that Transpire waived any potential privilege by disclosing or including DCA's or Pryme's employees on the communications in dispute. *See* [DE 136] at 8-10. I conclude that the attorney-client privilege was not waived purely because of the involvement of DCA and Pryme because the

identified employees of DCA and Pryme were the functional equivalents of employees of Transpire, making them privileged persons for purpose of the attorney-client privilege.

Privileged information is generally not discoverable. *See* Fed. R. Civ. P. 26(b). Courts determine the applicability of privileges under federal common law where, as here, subject-matter jurisdiction is based on federal-question jurisdiction. *See Meyer v. Gwinnett Cnty. Police Dep't*, No. 21-12851, 2022 WL 2439590, at *7 (11th Cir. July 5, 2022) (citing *Hancock v. Hobbs*, 967 F.2d 462, 466 (11th Cir. 1992)); Fed. R. Evid. 501. Federal common law recognizes the attorney-client privilege as one of the oldest privileges for confidential communications. *United States v. Zolin*, 491 U.S. 554, 562 (1989) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). It serves the public interest by encouraging full and frank communication between attorneys and their clients. *Id.* "[T]o claim attorney-client privilege, the proponent of the privilege must prove that what is sought to be protected is (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Att'ys, P.A.*, 519 F. Supp. 3d 1184, 1197 (S.D. Fla. 2021) (citing *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992)). "In addition to demonstrating the elements required to initially establish the privilege, the asserting party must prove that it has not waived the privilege." *Id.* (citing *United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990)).

"'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *United States v. Patel*, 509 F. Supp. 3d 1334, 1339 (S.D. Fla. 2020) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007)). In *Upjohn*, the Supreme Court addressed who may be deemed privileged persons in the corporate context, rejecting the "control group" test and holding that the attorney-

client privilege extends to communications with a company's employees with whom the attorney must consult to render legal advice to the company. 449 U.S. at 391-92; *Berisha v. Lawson*, 973 F.3d 1304, 1317 (11th Cir. 2020). *Upjohn*'s rationale is built on the idea that "an overly restrictive view of the individuals who qualify as representatives of an attorney's corporate client threatens to frustrate the attorney's efforts to formulate sound legal advice based on information possessed by those directly involved in the matter." *Berisha*, 973 F.3d at 1319.

Many courts—including courts in the Eleventh Circuit—have extended the logic of *Upjohn* to third-party consultants or independent contractors acting as "functional employees" of the company. *See, e.g.*, *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994); *United States v. Advanced Pain Mgmt. & Spine Specialists of Cape Coral & Fort Myers*, No. 17-CV-272-FTM-29, 2018 WL 4381192, at *4 (M.D. Fla. June 28, 2018); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001). Although the Eleventh Circuit itself has not officially adopted the "functional employee" or "employee equivalent" extension of *Upjohn*, it has applied it in cases involving New York law. *See Berisha*, 973 F.3d at 1318-19. Upon review, this Court agrees with numerous others that "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice." *Copper*, 200 F.R.D. at 219; *see also Berisha*, 973 F.3d at 1319 ("[T]he privilege must extend to cover 'nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the subject of legal services,' and who therefore 'have the relevant information needed by corporate counsel' to advise the client." (quoting *Bieter*,16 F.3d at 938)).

In *Copper*, the district court held that a foreign company's third-party consultant, a "crisis management" public relations firm, was the functional equivalent of an employee and thus could

be equated with the company for purposes of invoking the attorney-client privilege. 200 F.R.D. at 219-20. Anticipating a government investigation, litigation, and press scrutiny after a trading scandal emerged, the company hired the consultant to handle public relations matters, such as by preparing statements for public release and internal documents for informing employees about what they could publicly disclose. *Id.* at 215-16, 219. The company hired the consultant because the company lacked experience with publicity from high-profile litigation and with Western media. *Id.* at 215. In determining that the communications involving the consultant could be privileged, the district court stressed a variety of things suggesting that the consultant was acting as a functional employee: (1) the consultant had essentially been incorporated into the company's staff to perform a corporate function that was necessary in the context of the government investigation, anticipated litigation, and press scrutiny; (2) the company lacked the internal resources to cover the task; (3) the consultant could make decisions on behalf of the company regarding its public relations strategy; (4) the potential legal effects and adverse uses of the statements and internal documents that the consultant created were material factors to consider during development; (5) the consultant sought advice from the company's counsel and was privy to the advice concerning the scandal and related litigation; (6) the consultant's communications concerned matters within the scope of its duties for the company; and (7) the consultant's employees were aware that the communications were for the purpose of obtaining legal advice from in-house and outside counsel. *Id.* at 219.

Accordingly, confidential communications between the consultant and the company's counsel, or between the consultant and the company, or among the consultant, the company's in-house counsel, and the company's outside counsel "that were made for the purpose of facilitating the rendition of legal services to [the company] c[ould] be protected from disclosure by the

attorney-client privilege." *Id.*; *see also F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (holding that communications that GSK shared with its public relations and government affairs consultants were covered by attorney-client privilege because affidavit showed that GSK's corporate counsel "worked with these consultants in the same manner as they did with full-time employees" and that consultants became "integral members of the team assigned to deal with issues that were completely intertwined with GSK's litigation and legal strategies" (citation modified)); *In re Flonase Antitrust Litig.*, 879 F. Supp. 2d 454, 459-60 (E.D. Pa. 2012) (applying "broad practical approach" to hold that consultant was functional equivalent of employee of GSK by focusing on "whether the communications at issue were kept confidential and made for the purpose of obtaining or providing legal advice"). *But see, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 352 F. Supp. 3d 207, 214 (E.D.N.Y. 2019) (holding that defendant failed to show that individuals "played such exceptional roles . . . that they should be treated as anything other than typical part-time consultants").[3]

Here, the declarations provided by Transpire sufficiently establish that a number of DCA's and Pryme's employees were functional employees of Transpire for the inhaler project and thus could participate in communications without Transpire waiving its attorney-client privilege. Like the consultant firm in *Copper*, which had essentially been incorporated into the company's staff to perform necessary public relations work to address a governmental investigation, anticipated

[3] The Court is cognizant of the potential concern that reading the functional-employee or employee-equivalent rule too broadly "might threaten to sweep within the privilege conversations between a lawyer and various individuals who have not previously been considered to fall within the ambit of the privilege . . . ." *Berisha*, 973 F.3d at 1319. But, as explained in this order, neither DCA nor Pryme is "simply a witness or passerby to the company's activities." *Id.* Both were heavily involved in the creation of the generic inhaler device, worked intimately with Transpire and Transpire's counsel with respect to the tasks for which they were retained, treated the information as confidential, and were aware of the litigation risks involved. The principles of *Upjohn* therefore apply. *See Flonase*, 879 F. Supp. 2d at 459-60.

litigation, and press scrutiny, DCA and Pryme were essentially incorporated into Transpire's staff for the work necessary to pursue an ANDA with a Paragraph IV certification—an act of infringement that, by design, anticipates legal proceedings against Transpire as the ANDA applicant. Due to their heavy, employee-like involvement on a matter saturated with legal implications, the Court sees no reason to restrict the applicability of the attorney-client privilege purely because DCA's and Pryme's employees are not on Transpire's payroll, especially where those at Transpire, DCA, and Pryme treated the communications as confidential.

Starting with DCA, Transpire engaged it "to provide specialized technical, engineering, design, and development services relating to Transpire's inhaler device in furtherance of Transpire's plan to pursue an ANDA with a Paragraph IV certification for GSK's Breo Ellipta product." [DE 124-2] ¶ 22, at 5. Critically, "[t]hose services were performed to support the development and technical analyses necessary for that effort and *required expertise that Transpire did not possess internally*." *Id.* (emphasis added); *see also id.* ¶ 28 ("DCA provided specialized technical information and engineering expertise that was necessary for Transpire's counsel."). Transpire needed to rely on companies like DCA for their expertise "[b]ecause of its size and limited employee personnel." *Id.* ¶ 9. Indeed, Transpire had less than a dozen employees throughout most of 2022. *Id.* In performing the duties for which it was primarily responsible, DCA worked closely with Transpire's engineers, technical personnel, and counsel in an iterative process. *Id.* ¶ 27; [DE 124-3] ¶ 6. DCA ultimately ended up spending "thousands of man hours" working with Transpire's employees and counsel on the inhaler project. [DE 124-3] ¶ 10. The legal effects of proposed designs, including patentability and infringement risks, were material considerations during development of proposed designs and required constant back-and-forth communications with counsel. *See* [DE 124-2] ¶¶ 13, 16-18, 24, 27-33. Furthermore, DCA understood that the

communications were confidential and maintained them as such internally and externally. [DE 124-3] ¶¶ 14-16. The agreement with DCA contained a confidentiality provision. *See* [DE 127-1] ¶ 6, at 13. And DCA did not disclose the relevant communications except as authorized by Transpire or its counsel. [DE 124-3] ¶ 16. DCA likewise managed the security of access to project information stored on its premises and its servers. *Id.*

The record therefore reflects that multiple DCA employees played an important role in the inhaler project, acted as functional employees of Transpire, and could be included in communications without causing Transpire to waive its attorney-client privilege. *Cf. Flonase*, 879 F. Supp. 2d at 460 (holding that consultant was functional equivalent of GSK where it acted as an integrated and involved member of brand maturation team, did work touching on legal and regulatory issues, kept documents confidential, and acted as if the attorney-client privilege applied).

The same goes for Pryme. Transpired retained Pryme in April 2025 to develop the packaging and labeling concepts for Transpire's generic version of the Breo Ellipta inhaler. [DE 124-2] ¶¶ 35, 37. According to Transpire's Dr. Wang, "Transpire retained PRYME because it lacked the internal personnel with specialized expertise necessary to develop pharmaceutical packaging and labeling designs for a product intended for FDA review and commercialization." *Id.* ¶ 36. Transpire understood from the time that it engaged Pryme that the packaging and labeling of the generic inhaler device implicated legal considerations. *Id.* ¶ 39. Transpire and its counsel worked closely with Pryme as it prepared packaging and labeling concepts, with Transpire's counsel reviewing Pryme's designs for legal compliance. *Id.* ¶¶ 39-41; [DE 124-4] ¶¶ 6-7. Transpire and Pryme also treated the communications as confidential. [DE 124-2] ¶ 43; [DE 124-4] ¶¶ 8, 15-17. Transpire and Pryme even signed a non-disclosure agreement to help preserve

confidentiality. [DE 124-2] ¶ 35; [DE 124-4] ¶ 8; [DE 127-3] at 13-19. These record facts lead to the same conclusion that Transpire did not necessarily waive the attorney-client privilege by including some of Pryme's employees in communications related to the inhaler project.

Even so, GSK challenges Transpire's submitted declarations by asserting that they "do[] not indicate that DCA and Pryme were necessary for a legal purpose rather than a business purpose . . . ." [DE 136] at 8 (emphasis removed) (citation omitted). In GSK's view, DCA and Pryme were retained for design and engineering work that would have been necessary regardless of pending or anticipated litigation. *Id.* While pursuing a generic version of the Breo Ellipta inhaler is certainly connected to a business purpose, the prospect of litigation with the Paragraph IV certification and the highly regulated nature of pharmaceutical industry itself sufficiently infused a legal purpose into the inhaler project for which DCA and Pryme were necessary. The declarations submitted by Transpire explain how counsel needed to review DCA's and Pryme's work to advise Transpire on legal and regulatory compliance in an iterative manner, especially considering the substantial likelihood of litigation with GSK after Transpire had decided on pursuing an ANDA with a Paragraph IV certification. GSK next argues that Transpire has not provided particularized facts about the work or expertise of each DCA and Pryme employee copied on communications with Transpire. *See* [DE 136] at 9-10. However, this argument is better addressed below in the discussion of Transpire's privilege log.

In short, multiple of DCA's and Pryme's employees acted as functional employees of Transpire and thus are privileged persons for purpose of the attorney-client privilege.[4]

---

[4] Because I conclude that multiple DCA and Pryme employees were functionally equivalent to Transpire employees and thus constitute privileged persons for purpose of the attorney-client privilege, I do not consider whether the common-interest or joint-defense exception to waiver applies.

Communications involving them may be subject to attorney-client privilege. "However, whether the privilege applies to each communication must be determined on a case-by-case basis under the principles established in *Upjohn*." *Flonase*, 879 F. Supp. 2d at 460. The Court will address the privilege log after considering whether the work-product doctrine can apply.

## II. WORK-PRODUCT DOCTRINE

Transpire separately argues that the at-issue documents are protected by the work-product doctrine. [DE 124] at 7-9. GSK responds that Transpire has not shown that the at-issue documents were created in anticipation of litigation and that the doctrine does not apply just because Transpire foresaw a Paragraph IV certification and ANDA litigation. *See* [DE 136] at 12-13. I conclude that documents created after Transpire formed a plan to pursue an ANDA through a Paragraph IV certification may constitute protected work product.

Rule 26 of the Federal Rules of Civil Procedure codifies the work-product doctrine: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). "The work product doctrine protects from disclosure documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's attorney acting for his client." *Diamond Resorts*, 519 F. Supp. 3d at 1200 (quoting *Atriums of Palm Beach Condo. Assn., Inc. v. QBE Ins., Co.*, No. 08-80543-CIV, 2009 WL 10667478, at *3 (S.D. Fla. June 17, 2009)). The burden of establishing that the work-product doctrine applies is on the party invoking it. *Id.*

(citation omitted); *Holladay v. Royal Caribbean Cruises, Ltd.*, 333 F.R.D. 588, 592 (S.D. Fla. 2019) (citations omitted).[5]

Documents are prepared in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Goosby v. Branch Banking & Tr. Co.*, 309 F. Supp. 3d 1223, 1233 (S.D. Fla. 2018) (quoting *Devs. Sur. & Indem. Co. v. Harding Vill., Ltd.*, No. 06-21267CIV, 2007 WL 2021939, at *2 (S.D. Fla. July 11, 2007)). The work-product doctrine generally does not apply if the document was prepared in the ordinary course of business or would have been created in substantially the same form regardless of whether there was litigation. *Worley v. NCL (Bahamas) Ltd.*, No. 21-CV-21138, 2021 WL 6037600, at *2 (S.D. Fla. Dec. 20, 2021); *see Burrow v. Forjas Taurus S.A.*, 334 F. Supp. 3d 1222, 1227 (S.D. Fla. 2018).

Documents created after a decision to pursue an ANDA though a Paragraph IV certification can be protected by the work-product doctrine. *See Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, No. 04 CIV. 1966 (DLC), 2005 WL 1678001, at *5 (S.D.N.Y. July 19, 2005). In *Takeda*, the owner of patents for a drug moved to compel the defendants, generic drug companies, to produce all documents concerning the patent searches performed and the scientific positions formulated by non-legal employees of the defendants' sister company. *Id.* at *1. The defendants refused to disclose this information, relying on the work-product doctrine. *Id.* at *2. Although the district

[5] There are two types of work product—fact and opinion. *Burrow*, 334 F. Supp. 3d at 1229. Fact work product encompasses factual material, such as the results of an investigation, whereas opinion work product encompasses the impressions, conclusions, opinions, or legal theories of counsel or a party's representative about litigation. *See id.* While fact work product may be compelled upon a showing of substantial need and undue hardship, opinion work product may only be compelled in exceptional circumstances. *Id.*

court held that the initial searches and positions were not eligible for protection, it concluded that documents created after the defendants had determined that the at-issue patent was subject to attack via an ANDA and Paragraph IV certification *could* (although not necessarily *would*) be eligible for work-product protection—upon the production of an updated privilege log. *See id.* at *3-5.

The difference between the documents created before and after the defendants formulated a plan to assert the invalidity of the at-issue patent was that the defendants regularly conducted initial patent searches and did analyses of those searches in the ordinary course of their business. *Id.* at *3. The district court emphasized that the ordinary searches and analysis of patents "may yield a range of different results and may suggest varied courses of action, most of which do not contemplate, much less provoke, litigation." *Id.* Only the documents created after the defendants determined that the relevant patent was subject to attack as invalid were potentially eligible for work-product protection. *Id.* at *5; *see also In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 185 (D.N.J. 2003) ("Simply stated, litigation (in the form of a patent infringement action) is almost certain to follow a Paragraph IV Certification.").

Here, the documents created after Transpire elected to pursue an ANDA through a Paragraph IV certification may be protected by the work-product doctrine. The submitted declarations indicate that Transpire formed a plan to try and obtain an ANDA via a Paragraph IV certification in July 2022. [DE 124-2] ¶ 21 ("By July 5, 2022, Smoore and Transpire, in consultation with counsel, had decided to pursue an ANDA for GSK's Breo Ellipta product though a Paragraph IV certification and had begun work necessary to support that strategy."). Like the documents created after the generic drug manufacturers determined that the patent in *Takeda* was subject to attack as invalid, the documents created after Transpire formed its plan to pursue an ANDA with a Paragraph IV certification could be protected work product produced in anticipation

of litigation. *See* 2005 WL 1678001, at *5. As a result, documents created on or after July 5, 2022, could reasonably have been created in anticipation of litigation because Transpire had decided to pursue an ANDA through a Paragraph IV certification, making an action for patent infringement "almost certain." *Gabapentin*, 214 F.R.D. at 185.

Transpire has therefore established that the work-product doctrine could apply to the at-issue communications.

## III. PRIVILEGE LOG SUFFICIENCY

However, just because the attorney-client privilege and work-product doctrine could apply here does not mean that they apply to *each* document for which they are asserted. The Court must therefore turn to Transpire's privilege log and supporting declarations. Yet the privilege log and supporting declarations do not provide enough information for the Court to conclude with any degree of certainty that the communications at issue are categorically privileged or immune. The Court will thus require Transpire to produce to GSK an amended privilege log.

This Court's local rules generally "require[] preparation of a privilege log with respect to all documents, electronically stored information, things and oral communications withheld on the basis of a claim of privilege or work product protection . . . ." S.D. Fla. L.R. 26.1(e)(2)(C). "The standard for testing the adequacy of the privilege log is whether, *as to each document*, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *United States v. Sigman*, No. 11-80155-CR, 2013 WL 5890714, at *5 (S.D. Fla. Nov. 4, 2013) (emphasis added) (quoting *CSX Transp. Inc. v. Admiral Ins. Co.*, No. 93-132-CIV-J-10, 1995 WL 855421, at *3 (M.D. Fla. July 20, 1995)). "A proper privilege log should identify 'each document and the individuals who were parties to the communications *with sufficient detail* to permit the compelling party or court to determine if the privilege is properly claimed.'" *TIC*

*Park Ctr. 9, LLC v. Cabot*, No. 16-24569-CIV, 2017 WL 9988744, at *4 (S.D. Fla. June 1, 2017) (emphasis added) (quoting *Arthrex, Inc. v. Parcus Med., LLC*, 2012 WL 3778981, at *4 (M.D. Fla. Aug. 31, 2012)). This Court has previously explained that proper privilege logs contain the following information:

> (1) the name and job title or capacity of the author of the document; (2) the name and job title or capacity of each recipient of the document; (3) the date the document was prepared and if different, the date(s) on which it was sent to or shared with persons other than the author(s); (4) the title and description of the document; (5) the subject matter addressed in the document; (6) the purpose(s) for which it was prepared or communicated; and (7) the specific basis for the claim that it is privileged.

*Id.* "The focus is on the specific descriptive portion of the log, and not on the conclusory invocations of the privilege or work-product rule, since the burden of the party withholding documents cannot be 'discharged by mere conclusory or ipse dixit assertions.'" *Sigman*, 2013 WL 5890714, at *5 (quoting *CSX Transp.*, 1995 WL 855421, at *3). "It is possible, however, for a party to refer to other evidentiary submissions, such as affidavits, to support otherwise insufficient privilege logs to establish the elements of a privilege or immunity exist." *CSX Transp.*, 1995 WL 855421, at *4; *TIC Park*, 2017 WL 9988744, at *4. Absent extraordinary circumstances or dilatory conduct, courts normally give parties an opportunity to correct a deficient privilege log before determining that a privilege has been waived. *See Dykstra v. Fla. Foreclosure Att'ys, PLLC*, 191 F. Supp. 3d 1378, 1380 (S.D. Fla. 2016) ("[E]ven if the Court were to find that Defendants' privilege log is insufficient, the Court would not normally be inclined to find that the privilege is waived and would likely give Defendants additional time to submit a proper privilege log, absent extraordinary circumstances or dilatory conduct.").

Upon review of Transpire's privilege log and supporting documentation, it has not provided the Court with enough information for it to conclude that the things withheld are

categorically protected. As GSK points out, *see* [DE 136] at 11, a cursory review of the privilege log reveals that Transpire primarily relies on two general descriptions of subject matter—which vary depending on whether an attorney was copied, *see* [DE 124-1] at 1-8. Because the subject-matter descriptions do not provide any information to enable the Court to determine, for each document or communication, why that document or communication meets the elements of the attorney-client privilege or work-product doctrine, the descriptions are too formulaic, vague, and conclusory to be sufficient. Without more, the Court simply cannot assess whether each document or communication was made for legal advice or in anticipation of litigation.

Looking at the declarations, they do not cure the defects in the privilege log. Although Transpire's submitted declarations provide context regarding the overall nature of the communications and somewhat describe the position or role of each person copied, they do not add to the subject matter of each communication. The Court is thus left with two conclusory descriptions that Transpire uses for the bulk of the forty-six documents or communications in dispute.[6] Transpire's descriptions are even more problematic given GSK's noted concerns regarding whether the at-issue communications or documents were for primarily business rather than legal reasons. Transpire's privilege-log descriptions do not help the Court in determining whether any particular entry on the log was made for legal advice or made primarily because of the looming ANDA litigation. Neither the attorney-client privilege nor work-product doctrine will cloak communications or documents based on the ANDA litigation alone. More is required for

---

[6] Although a "categorical" privilege log can sometimes be appropriate, there is no indication that it would be in this case because only forty-six documents or communications are at issue. *Cf. TIC Park*, 2017 WL 9988744, at *4 ("There is little doubt that a categorical privilege log is inappropriate in this case because this action involves less than 500 documents at issue.").

Transpire to meet its burden in this case.[7] It must provide facts for each communication or document showing that it was made primarily for the purpose of securing legal advice or primarily in anticipation of litigation (such that it would not have been produced in substantially the same form without the prospect of litigation).

**CONCLUSION**

For the foregoing reasons, it is **ORDERED and ADJUDGED** as follows:

1. The Motion [DE 124] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is granted to the extent that Transpire seeks a ruling (1) that it did not waive the attorney-client privilege purely because information was disclosed to DCA and Pryme and (2) that the work-product doctrine could apply to the documents at issue. However, the Motion is denied to the extent that it seeks a definitive ruling that all at-issue communications or documents are privileged or immune and should be subject to a protective order. Transpire has not provided the Court with a sufficient factual basis to conclude each communication should be protected.

2. On or before **October 16, 2026**, Transpire shall provide GSK with an amended privilege log that more adequately explains the facts setting forth why *each* communication or document at issue is protected by either the attorney-client privilege or work-product doctrine. Transpire may also provide additional evidence, such as supplemental declarations, to GSK.

3. If upon review of Transpire's amended privilege log and additional evidence (if applicable), GSK continues to believe that Transpire has not shown that the at-issue documents or

[7] Although Transpire and GSK both seek *in camera* review as alternative relief, the Court will not review the communications *in camera* at this time. Instead, the Court will require an amended privilege log. This way, GSK (and the Court if *in camera* review is ultimately necessary) will be in a better position to determine whether Transpire has carried its burden for each at-issue communication or document.

communications are subject to any protection, Transpire may re-raise this dispute with the Court by no later than **October 23, 2026**.

4. Transpire's Motion for Protective Order [DE 121] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 9th day of October 2026.

Jared M. Strauss
United States Magistrate Judge